CASE TYPE: Employment

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

| | |
|---|---|
| Personal Wealth Partners, LLC,<br><br><br><br>                    Plaintiff,<br>vs.<br><br>Gary Dean Ryberg; Kestra Investment<br>Services, LLC,<br><br>                 Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No.:<br><br><br><br>)<br>)   **SUMMONS**<br>)<br>)<br>)<br>)<br>) |

THIS SUMMONS IS DIRECTED TO THE ABOVE-NAMED DEFENDANTS.

**YOU ARE BEING SUED**. Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

**YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this summons **a written response** called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

Aimée D. Dayhoff
Winthrop & Weinstine, P.A.
225 South Sixth Street, Suite 3500
Minneapolis, Minnesota 55402

**YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer, you must state whether you agree or disagree with each paragraph of the Complaint. If you believe Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

**YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the

EXHIBIT
A

Complaint, you do not need to respond.  A default judgment can then be entered against you for the relief requested in the Complaint.

**LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

**ALTERNATIVE DISPUTE RESOLUTION.**  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated:  December 3, 2021

WINTHROP & WEINSTINE, P.A.

*s/ Aimée D. Dayhoff*
Aimée D. Dayhoff, #0319041
Olga Tymouch, #0400280
3500 Capella Tower
225 South Sixth Street
Minneapolis, MN 55402-4629
(612) 604-6400
adayhoff@winthrop.com
otymouch@winthrop.com

*Attorneys for Plaintiff*

22979541v1

2

CASE TYPE: Employment

STATE OF MINNESOTA                                  DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT

_____

Personal Wealth Partners, LLC                File No.:

                    Plaintiff,

vs.

Gary Dean Ryberg; Kestra Investment         **COMPLAINT**
Services, LLC

                    Defendants.

_____

 Plaintiff Personal Wealth Partners, LLC ("PWP"), as and for its Complaint against Gary Dean Ryberg ("Ryberg") and Kestra Investment Services, LLC ("Kestra") (collectively, "Defendants"), states and alleges as follows:

### PARTIES AND JURISDICTION

 1. Plaintiff PWP is a Minnesota limited liability company with a principal executive office located at 7900 International Drive, Suite 510, Bloomington, Minnesota 55425.

 2. Defendant Gary Dean Ryberg is a resident of the State of North Dakota who is believed to reside at 1905 2nd Avenue East, Williston, North Dakota 58801.

 3. Defendant Kestra is a limited liability company with a principle executive office located at 5707 Southwest Parkway, Building 2, Suite 400, Austin, Texas 78735. Kestra has a registered office address in Minnesota at 1010 Dale St N St Paul, Minnesota 55117–5603.

 4. Jurisdiction is proper over Ryberg pursuant to a Confidentiality and Non-Competition Agreement (the "Employment Agreement"), which states that "[t]his Agreement and any claims or actions related thereto shall be governed by the laws of the state of Minnesota. The

parties agree that any dispute or claim relating to this Agreement shall be venued or heard in the state of Minnesota or in a FINRA arbitration, if appropriate." A true and correct copy of the Employment Agreement is attached hereto as **Exhibit A**.

5.      Jurisdiction is proper over Kestra pursuant to Minn. Stat. § 543.19, subd. 1(2) and (4), because on information and belief, Kestra transacts business within the State of Minnesota, it has a registered office in Minnesota and its acts have caused injury in Minnesota.

6.      Venue is proper in Hennepin County pursuant to Minn. Stat. § 542.09 by agreement of some of the parties as described within the Employment Agreement. (Exhibit A, par. 9)

## FACTUAL ALLEGATIONS

7.      PWP is an SEC registered investment advisor with offices in Bloomington, Minnesota; River Falls, Wisconsin; and Williston, North Dakota.

8.      In April of 2014, Daniel E. Steichen ("Steichen") and PWP purchased the Williston practice of PWP from Douglas E. Taylor ("Taylor") of LPL Financial and made regular payments to Taylor over time until the final payment was made on April 16, 2020.

9.      Between April of 2014 and January of 2016, Steichen personally worked with Taylor to convert and move his clients from LPL Financial to PWP. Taylor continued to work in the Williston Office of PWP until December 31, 2019.

10.      In January of 2016, Steichen hired Ryberg as an employee in the Williston Office of PWP. Ryberg was an Advisor and Registered Representative with PWP. As such, he was responsible for serving clients on behalf of PWP in the Willison office. His primary job responsibilities included helping clients to set financial goals, determine their financial strategies, and review their progress, as well as set up a personal financial plan, and provide clients with

2

services ranging from estate planning, to fixed income planning, to education and retirement planning.

11.     Upon commencing his employment with PWP, Ryberg entered into an Employment Agreement in which he agreed to "not use or disclose, other than in direct connection with [his] relationship with [PWP], any Confidential Information to any person not employed by [PWP] or not authorized by [PWP] to receive such Confidential Information without the prior written consent of [PWP]." Per the agreement, he also agreed to "use reasonable and prudent care to safeguard, protect, and prevent the unauthorized use of and disclosure of Confidential Information." (Ex. A, para. 4.)

12.     Per the agreement, "Confidential Information" is defined as "information that is proprietary to [PWP] or proprietary to others and entrusted to [PWP], whether or not trade secrets" and includes:

> information relating to business plans and business as conducted or anticipated to be conducted, past, current or anticipated customers, vendors or marketing plans, price lists, cost information, drawings, designs, project specifications, internal marketing information, internal procedures and policies, customer lists, account names, inventory information, contacts, addresses and sales activity, tax and financial information, intellectual property, banking/financial information, employee/contractor information, customer information, vendor/manufacturer information, and related information.

(Ex. A, para. 4.)

13.     PWP takes extensive measures to protect all confidential information (including client data), including its clients' names, contact information as well as various financial information related to those clients. In order to log into PWP's computer systems, a multi-factor login using DUO, a Microsoft product, is required. PWP does this in order to maintain its competitive advantage as well as to meet its clients' expectations that it will protect and maintain their personally identifiable information.

3

14.     PWP does not share its confidential information with competitors.

15.     In a further effort to protect its confidential information, PWP required Ryberg to enter into an Employment Agreement containing a confidentiality provision. (*See* Ex. A, para. 4.)

16.     After Ryberg was hired by PWP, he moved to Williston from Bowbells, North Dakota solely for his employment at PWP. At that time, he was not acquainted with any Williston residents or PWP clients.

17.     Between January of 2016 until March of 2020, Steichen regularly traveled to Williston, North Dakota to meet with clients along with Taylor and Ryberg in order to introduce Ryberg to PWP clients and to familiarize Ryberg with PWP practices.

18.     Ryberg did not develop a book of business through cold calls or his own connections. Rather, upon joining PWP, Ryberg was assigned a group of about 325 PWP clients with approximately $144,000,000 in assets to service under PWP's management.

19.     As an employee who would be servicing PWP clients, Ryberg was given access to PWP's extensive client records and information, including clients transactional histories, account types, account balances, proprietary asset allocations, income, liquid and total net worth, tax status, tax information, investment objectives, and other personal financial information. This information is highly protected by PWP.

20.     On November 12, 2021, Ryberg abruptly resigned.

21.     As of the same date of his resignation, November 12, 2021, Ryberg was employed by and registered with Kestra.

22.     In the months leading up to his abrupt resignation, Ryberg pretended to be a faithful and loyal employee of PWP. However, unbeknownst to PWP, Ryberg was engaging in nefarious

behavior with a PWP competitor to destroy the office for which Ryberg was specifically hired and entrusted to oversee.

23.     In order to be registered and employed by Kestra on the date upon which he provided his resignation, Ryberg had to register as an agent in the states in which PWP's clients resided, seek tax advice, and lobby PWP clients to transfer their accounts while still employed by PWP.   Indeed,   in   his   resignation   letter,   Ryberg   specifically   wrote: "Although I anticipate a smooth transition, please understand that I value my client relationships and know that many of the clients I serviced will seek to follow me."  Accordingly, Ryberg already knew, on the day of his resignation, that some PWP clients would be transferring their accounts to him at Kestra.

24.     Such behavior is not foreign to Kestra, as demonstrated by the fact that FINRA fined Kestra Investment Services, LLC in 2020 for sharing personal client data with a third-party vendor. Kestra had engaged the vendor to assist newly hired brokers with the transfer of client accounts to Kestra from competing broker-dealers. Between November of 2017 and February of 2019, sixty-eight registered representatives joined Kestra from other firms. Each of these brokers disclosed personal client data to the vendor, including social security numbers, driver's license numbers, annual income, net worth, and other personal and financial information, for clients that they hoped to transfer to Kestra from their prior firms. A true and correct copy of a news report regarding the incident from AdvisorHub, dated April 29, 2020, is attached hereto as **Exhibit B.**

25.     With Ryberg's willing assistance, Kestra is attempting to destroy PWP by acquiring a highly profitable wealth management business without paying for it either through capital investment or its purchase from PWP.

26.     By doing so, Kestra has essentially decimated PWP's Williston office.  Not only has its only Williston-based financial advisor left and gone to work for Kestra but so have its clients.

27.     Upon receiving Ryberg's letter of resignation on November 12, 2021, Steichen promptly and clearly communicated to affected clients how their accounts would continue to be serviced and provided clients with timely and complete answers to questions regarding Ryberg's resignation pursuant to FINRA Regulatory Notice 19-10.

   a.  On November 12, 2021 at 9:00 a.m., approximately fifteen minutes after Ryberg submitted his resignation, Steichen spoke with Taylor, who informed him that approximately two to three months prior to Ryberg's resignation, Ryberg had informed him that he intended to set up a competing financial planning firm in Williston and to resign from PWP once the new firm was operational.  On this same call, Taylor also told Steichen that he was moving his and his family's PWP investment accounts to Ryberg at Kestra.

   b.  On November 14, 2021, Steichen spoke with PWP Client No. 1, who informed him that he might transfer his accounts to Ryberg at Kestra. Client No. 1 has now transferred all of his accounts.

   c.  On November 20, 2021, Steichen spoke with PWP Client No. 2, who informed him that Ryberg had contacted him and that he might transfer his accounts to Ryberg at Kestra. At the time of this filing, Client No. 2 had not transferred any of his accounts.

> d. On November 21, 2021, Steichen spoke with PWP Client No. 3 who informed
> him that Ryberg had called him and begged him to transfer his accounts to
> Kestra. Client No. 3 had now transferred all of his accounts.
>
> e. On November 23, 2021, Steichen spoke with PWP Client No. 4, who informed
> him that Ryberg called him and told him that Kestra can provide all the same
> services as PWP, but at a lower cost. At the time of this filing, Client No. 4 had
> not transferred any of his accounts.

28.     As of this filing, 115 PWP accounts valued at approximately $42,900,000  have been transferred from PWP to Ryberg at Kestra. A list of the accounts, with personal information redacted, is attached hereto as **Exhibit E.**

29.     Prior to any transfers, the amount of investment assets managed by PWP totaled $144,000,000. Accordingly, PWP has now lost nearly 30% of its investment assets.

### COUNT I – INJUNCTIVE RELIEF
### (AGAINST ALL DEFENDANTS)

30.     PWP restates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

31.     By virtue of the foregoing and as set forth below, PWP has demonstrated a likelihood of success on the merits with respect to its claims for (1) breach of contract; (2) breach of duty of loyalty; (3) breach of duty of confidentiality; (4) tortious interference with contract; (5) tortious interference with prospective business relationship; (6) violation of the Minnesota Trade Secrets Act; and (7) misappropriation of trade secrets.

32.     Unless Ryberg and Kestra are enjoined from soliciting PWP's clients in violation of contractual and common law duties, PWP will continue to suffer irreparable harm, including, but not limited to:

7

    a. Disclosure of confidential information, including sensitive client data that is solely the property of PWP and its clients;

    b. Use of PWP's confidential information to solicit clients on behalf of a competitor;

    c. Loss of confidentiality to client records and financial dealings, loss of confidence, loss of goodwill, and loss of business reputation; and

    d. Potential future economic loss.

33. A balancing of the equities and public interest also favor the issuance of an injunction against Defendants.

34. Accordingly, PWP seeks the issuance of a temporary injunction enjoining Defendants from any continued direct or indirect solicitation of PWP clients while a trial proceeds on the merits.

## COUNT II – BREACH OF CONTRACT
## (AGAINST DEFENDANT GARY DEAN RYBERG)

35. PWP restates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

36. PWP and Ryberg entered into a valid and enforceable contract – namely, the Employment Agreement which contained provisions regarding confidentiality. (*See* Ex. A, para. 4.) The confidentiality provisions are reasonable and necessary for the protection of PWP's goodwill, proprietary, confidential, and trade secret information, as well as other valuable business assets.

37. Ryberg breached the Employment Agreement by, among other things, (a) encouraging PWP clients to transfer their client accounts from PWP to Kestra and (b) making

available, divulging, and/or using for Ryberg's own benefit and/or for the benefit of Kestra, PWP's proprietary, confidential and trade secret information.

38.     Ryberg continues to breach the Employment Agreement by:

    a.  Soliciting clients to transfer their accounts from PWP to Kestra after resigning from PWP;

    b.  Misappropriating PWP's confidential information;

    c.  Failing to return all confidential information in his possession upon resigning from PWP; and

    d.  Using PWP's confidential and proprietary client information to solicit PWP's clients to transfer their accounts to Kestra or for other purposes not authorized by PWP.

39.     Ryberg's breach of his contractual obligations to PWP has caused and will continue to cause PWP monetary damages and irreparable harm, including but not limited to loss of client relationships and goodwill.

40.     By this Count, PWP is entitled to immediate injunctive relief and damages, which include, among other things, costs, expenses and fees, including attorneys' fees in an amount in excess of $50,000, the exact amount to be determined at trial.

### COUNT III – BREACH OF DUTY OF LOYALTY
### (AGAINST DEFENDANT GARY DEAN RYBERG)

41.     PWP restates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

42.     While an employee of PWP, Ryberg owed PWP a duty of loyalty, which included, without limitation, the duty to not:

    a.  Act in opposition to PWP's interests;

    b. Use his position with PWP for personal gain at the expense of PWP;

    c. Use PWP's property and information, including confidential information, for his own purpose or for the purpose of any third party;

    d. Compete with PWP regarding the subject matter of his employment while still employed by PWP.

43.    Ryberg breached his duty of loyalty to PWP by, prior to his separation of employment with PWP, informing PWP clients of his intent to accept an offer of employment with Kestra, encouraging PWP clients to transfer their client accounts from PWP to Kestra, and setting up a competing investment firm with Kestra while still an employee of PWP.

44.    Ryberg's breach of his common law duties to PWP has caused and will continue to cause PWP monetary damages and irreparable harm, including but not limited to loss of client relationships and goodwill.

45.    By this Count, PWP is entitled to immediate injunctive relief and damages, which include, among other things, costs, expenses and fees, including attorneys' fees in an amount in excess of $50,000, the exact amount to be determined at trial.

### COUNT IV – BREACH OF DUTY OF CONFIDENTIALITY
### (AGAINST DEFENDANT GARY DEAN RYBERG)

46.    PWP restates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

47.    Ryberg owes PWP a continuing duty not to disclose PWP's confidential and proprietary business information, and trade secrets.

48.    Upon information and belief, Ryberg has breached his continuing duty of confidentiality by improperly disclosing and using PWP's confidential and proprietary business information, and trade secrets.

10

49.     Unless enjoined, Ryberg will inevitably continue to use and/or disclose PWP's confidential and proprietary information, and trade secrets in violation of PWP's contractual and common law duties.

50.     As a direct and proximate result of Ryberg's breach of his duty not to disclose PWP's confidential and proprietary information, and trade secrets, PWP has incurred, and will continue to incur, substantial and irreparable harm and damage to its business, including but not limited to loss of client relationships and goodwill.

51.     By this Count, PWP is entitled to immediate injunctive relief and damages, which include, among other things, costs, expenses and fees, including attorneys' fees in an amount in excess of $50,000, the exact amount to be determined at trial.

### COUNT V – TORTIOUS INTERFERENCE WITH CONTRACT (AGAINST DEFENDANT KESTRA)

52.     PWP restates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

53.     PWP had (and continues to have) a valid contract with Ryberg.

54.     Kestra knew or should have known that PWP is engaged in a competing business, and that PWP's employees enter into contracts with PWP to support and further PWP's business. Accordingly, Kestra knew that Ryberg owed contractual obligations to PWP.

55.     Kestra intentionally and wrongfully interfered with PWP's contract with Ryberg by, among other things, inducing Ryberg to breach the Employment Agreement and encouraging PWP clients to transfer their client accounts from PWP to Kestra prior to Ryberg's resignation with PWP, and misappropriate PWP's confidential information and trade secrets.

56.     Kestra's interference with Ryberg's Employment Agreement has caused, and will continue to cause PWP monetary damages and irreparable harm, including but not limited to loss of client relationships and goodwill.

57.     By this Count, PWP is entitled to immediate injunctive relief and damages, which include, among other things, costs, expenses and fees, including attorneys' fees in an amount in excess of $50,000, the exact amount to be determined at trial.

## COUNT VI – AIDING AND ABETTING BREACH OF DUTY OF LOYALTY
### (AGAINST DEFENDANT KESTRA)

58.     PWP restates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

59.     As discussed above, Ryberg owed PWP a duty of loyalty during the tenure of his employment with PWP.

60.     Kestra knew or should have known that Ryberg owed PWP a duty of loyalty. Despite this, Kestra recruited and employed Ryberg for the purpose of, or while being aware that, Ryberg was breaching his duty of loyalty to PWP and misappropriating PWP's confidential information and trade secrets.

61.     On information and belief, Ryberg planned to resign from PWP, open a competing financial investment firm with Kestra, and transfer as many PWP client accounts to his new firm as possible. Kestra induced and/or enabled Ryberg to execute this plan, thereby aiding and abetting Ryberg in breaching his duty of loyalty to PWP.

62.     By aiding and abetting Ryberg in the breach of his common law duty of loyalty, Kestra acted in concert with Ryberg and is jointly liable for all the damages caused by Ryberg's improper conduct.

63.     Kestra's aiding and abetting Ryberg in breaching his duty of loyalty has caused and will continue to cause PWP monetary damages and irreparable harm, including but not limited to loss of client relationships and goodwill.

64.     By this Count, PWP is entitled to immediate injunctive relief and damages, which include, among other things, costs, expenses and fees, including attorneys' fees in an amount in excess of $50,000, the exact amount to be determined at trial.

### COUNT VII – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIP (AGAINST ALL DEFENDANTS)

65.     PWP restates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

66.     PWP had (and continues to have) valid business relationships with its clients.

67.     Defendants knew or should have known that PWP had (and continues to have) valid business relationships with its clients.

68.     Defendants intentionally and wrongfully interfered with PWP's business relationships with its clients by, without limitation, inducing and causing PWP's clients not to enter into or to discontinue their existing business relationships with PWP.

69.     Defendants purposefully and intentionally conspired to poach clients from PWP in order to bolster their own business at the expense of PWP. Consequently, 115 client accounts, totaling approximately $42,900,000 have been transferred from PWP to Kestra, and PWP has suffered a loss of nearly 30% of its investment assets and will continue to suffer indefinitely as a result of losing the future business from each of these clients.

70.    Defendants' interference has caused and will continue to cause PWP monetary damages and irreparable harm, including but not limited to loss of client relationships and goodwill.

71.    By this Count, PWP is entitled to immediate injunctive relief and damages, which include, among other things, costs, expenses and fees, including attorneys' fees in an amount in excess of $50,000, the exact amount to be determined at trial.

### COUNT VIII – VIOLATION OF THE MINNESOTA TRADE SECRETS ACT (AGAINST ALL DEFENDANTS)

72.    PWP restates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

73.    As a result of his employment with PWP, Ryberg obtained access to PWP's confidential and proprietary business information and trade secrets relating to PWP's business operations.

74.    PWP has taken, and continues to take, efforts that are reasonable under the circumstances to maintain the secrecy of its confidential and proprietary business information and trade secrets.

75.    As a result of his employment with PWP, and the knowledge and information gained therein, Ryberg will inevitably use and/or disclose PWP's confidential and proprietary information, and trade secrets.

76.    Upon information and belief, Kestra has improperly acquired access to, knowledge of, and utilized PWP's confidential and proprietary business information, and trade secrets via its employment of Ryberg.

77.    Upon information and belief, Defendants, in concert with one another, have utilized PWP's confidential business information, proprietary information, and trade secrets.

14

78.     Defendants' actions constitute a willful and malicious violation of the Minnesota Trade Secrets Act.

79.     Defendants' actual and/or threatened misappropriation of PWP's confidential and proprietary information and trade secrets has caused and will continue to cause PWP monetary damages and irreparable harm, including but not limited to loss of client relationships and goodwill.

80.     By this count, PWP is entitled to immediate injunctive relief and damages, which include, among other things, exemplary damages, costs, expenses and fees, including attorneys' fees, in an amount in excess of $50,000, the exact amount to be determined at trial.

### COUNT IX – MISAPPROPRIATION OF TRADE SECRETS (AGAINST ALL DEFENDANTS)

81.     PWP restates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

82.     As a result of his employment with PWP, Ryberg obtained access to PWP's confidential and proprietary business information and trade secrets relating to PWP's business operations.

83.     The confidential and proprietary information and trade secrets relating to PWP's business operations is not generally ascertainable by persons outside of PWP, provides a competitive advantage to PWP, and was developed at the expense of PWP.

84.     PWP intends to, and does, keep its confidential and proprietary information, and trade secrets confidential.

85.     Upon information and belief, Defendants have misappropriated and/or threatened to misappropriate PWP's confidential and proprietary information, and trade secrets relating to PWP's business operations.

86.     Upon information and belief, Defendants will inevitably use and/or disclose Plaintiff's confidential and proprietary information, and trade secrets in violation of their common law duties.

87.     Defendants' actual and/or threatened misappropriation of PWP's confidential and proprietary information and trade secrets in violation of their common law duties has caused and will continue to cause PWP monetary damages and irreparable harm, including but not limited to loss of client relationships and goodwill.

88.     By this Count, Plaintiff is entitled to immediate injunctive relief and damages in an amount in excess of $50,000, plus costs, expenses and fees, including attorneys' fees, the exact amount to be determined at trial.

**COUNT X – UNFAIR COMPETITION**
**(AGAINST ALL DEFENDANTS)**

89.     PWP restates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

90.     Defendants' conduct described herein constitutes unfair competition under Minnesota law. Defendants actively participated in, and induced others to carry out all of the acts of unfair competition outlined above. Moreover, Defendants' acts of unfair competition are willful and intentional.

91.     Defendants' unfair competition has caused and will continue to cause PWP monetary damages and irreparable harm, including but not limited to loss of client relationships and goodwill.

92.     By this Count, Plaintiff is entitled to immediate injunctive relief and damages in an amount in excess of $50,000, plus costs, expenses and fees, including attorneys' fees, the exact amount to be determined at trial.

**WHEREFORE**, Plaintiff respectfully requests the following relief:

1) An order:

    a)      Enjoining Defendants and anyone acting in concert with them, including any agent, officer, employee or representative, effective immediately, from using, disclosing, transmitting or continuing to possess for any purpose, the information contained in the records of PWP regarding those PWP clients whom Ryberg provided advisory services and whose names became known to him while employed by PWP, including, but not limited to, the names, addresses, and confidential information of those clients;

    b)      Enjoining Defendants and anyone acting in concert with them, including any agent, officer, employee or representative, effective immediately, from contacting or soliciting, either directly or indirectly, any and all clients for whom Ryberg provided advisory services and whose names became known to him while employed by PWP in an attempt to induce them to transfer some or all of their accounts from PWP to Defendants;

    c)      Preliminarily and temporarily restraining Defendants:

    d)      Awarding compensatory damages in excess of $50,000, in an amount to be determined at the trial of this matter;

    e)      Disgorgement and return of wages and benefits paid to Ryberg during the time he was should have been acting as a fiduciary to PWP, and thus rightfully belongs to PWP;

    f)      Awarding Plaintiff its reasonable attorneys' fees pursuant to Minn. Stat. § 45.026, and other applicable law;

    g)      Awarding all prejudgment and post judgment interest on all damages awarded;

    h)      Awarding Plaintiff its costs, disbursements and expenses incurred in pursuing this matter;

i)      Awarding Plaintiff other relief that the Court may deem appropriate.

Dated:  December 3, 2021                         WINTHROP & WEINSTINE, P.A.

                                                *s/Aimée D. Dayhoff*
                                                Aimée D. Dayhoff, #0319041
                                                Olga Tymouch, #0400280
                                                225 South Sixth Street, Suite 3500
                                                Minneapolis, Minnesota 55402
                                                (612) 604-6400
                                                adayhoff@winthrop.com
                                                otymouch@winthrop.com

                                                *Attorneys for Plaintiff*

18

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that pursuant to Minn. Stat. § 549.211, Subd. 2, costs, disbursements and reasonable attorney and witness fees may be awarded to the opposing party or parties in this litigation if the Court should find that the undersigned acted in bad faith, asserted a claim or defense that is frivolous and that is costly to the other party, asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass; or committed a fraud upon the Court.

Dated:  December 3, 2021

WINTHROP & WEINSTINE, P.A.

*s/Aimée D. Dayhoff*
Aimée D. Dayhoff, #0319041
Olga Tymouch, #0400280
225 South Sixth Street, Suite 3500
Minneapolis, Minnesota 55402
(612) 604-6400
adayhoff@winthrop.com
otymouch@winthrop.com

*Attorneys for Plaintiff*

22920573v2

# Exhibit A

# CONFIDENTIALITY
# AND
# NON-COMPETITION AGREEMENT

**THIS CONFIDENTIALITY AND NON-COMPETITION AGREEMENT** ("**Agreement**") is entered into as of the ___ day of January 2016, between the undersigned employee ("**Employee**") and **Personal Wealth Partners, LLC,** a Minnesota limited liability company ("**Company**").

**WHEREAS**, the Company has agreed to hire Employee conditioned upon the Employee executing this Agreement.  Employee recognizes that during the employment term, the Company will disclose certain valuable customer/vendor information as well as confidential and proprietary information which the Company has a legitimate interest in protecting.  As a result, Employee is willing to execute this Agreement and grant the Company the benefit of a confidentiality agreement and a covenant not to compete. Employee acknowledges that the terms and conditions of this Agreement were discussed, agreed to and understood prior to execution of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing promises and the mutual promises, covenants, and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     <u>**CONSIDERATION**</u>.  The consideration for this Agreement, which is acknowledged by Employee, is the Company's agreement to hire Employee, together with such additional employment compensation and/or benefits, specifically including, but not limited to, Employee's accompanying benefits of employment, and access to the Company's confidential business information.

2.     <u>**NOT AN EMPLOYMENT CONTRACT**</u>.  Employee acknowledges that this Agreement is not an employment contract, and that Employee's employment with the Company remains terminable at will by either party at any time, with or without cause.

3.     <u>**NON-COMPETITION AND NON-SOLICITATION**</u>.  Employee agrees that during the term of Employee's employment with the Company, and for a period of one (1) year following the date of Employee's termination of employment with the Company, for any reason, Employee agrees that Employee will not, either directly or indirectly, alone or as a partner, officer, director, shareholder, agent, employee, affiliate, contractor, advisor, consultant, subsidiary, parent Company, agent or assign of another firm or entity or corporation:

    a.     disrupt, damage, impair or interfere with the business of the Company, whether by way of interfering with or disrupting the Company's relationship with employees, vendors, contractors, customers, agents, representatives or vendors.

b.    induce or attempt to induce by soliciting or assisting anyone else in the solicitation of any of the Company's employees, contractors, vendors or former employees, contractors or vendors of the Company to leave employment or otherwise terminate their contract/relationship with the Company.

c.    compete with the Company by contacting, soliciting, diverting or contracting with any clients, customers, prospective customers or vendors of the Company with whom Employee conducted business, had contact or became acquainted with in any way during Employee's employment with the Company in the same or similar line of business as that of the Company. Competing and soliciting include, but are not limited to, soliciting or accepting orders from customers, diverting the customer's business from the Company soliciting vendors or diverting vendors' business from the Company, disparaging the Company or its employees with the customer or vendor, or otherwise interfering with the Company's business with the customer or vendor, even if the customer or vendor initiates contact with Employee.

**4.**    **CONFIDENTIAL INFORMATION AND PROHIBITIONS**. Employee will not use or disclose, other than in direct connection with Employee's relationship with the Company, any Confidential Information to any person not employed by the Company or not authorized by the Company to receive such Confidential Information without the prior written consent of the Company. Employee will use reasonable and prudent care to safeguard, protect, and prevent the unauthorized use of and disclosure of Confidential Information. "Confidential Information" means information that is proprietary to the Company or proprietary to others and entrusted to the Company, whether or not trade secrets. Confidential Information includes, but is not limited to, information relating to business plans and business as conducted or anticipated to be conducted, past, current or anticipated customers, vendors or marketing plans, price lists, cost information, drawings, designs, project specifications, internal marketing information, internal procedures and policies, customer lists, account names, inventory information, contacts, addresses and sales activity, tax and financial information, intellectual property, banking/financial information, employee/contractor information, customer information, vendor/manufacturer information, and related information. Any information Employee reasonably considers Confidential Information or that the Company treats as Confidential Information will be presumed to be Confidential Information, whether they or others originated it and regardless how they obtained it.

**5.**    **PROPRIETARY RIGHTS**. Employee agrees that all Work Product created solely or jointly by Employee or Employee's associates, or affiliates and assigns, relating to and arising from employment or work performed for the Company, or using the Company's facilities/equipment, or previously conceived in anticipation of employment, shall be deemed "work made for hire", and shall be the Company's property. "Work Product" shall mean all documentation, inventions, improvements, creative works,

2

marketing, and customer materials/information, know-how, Confidential Information and information created on behalf of the Company, in whole or in part, by Employee in creating the Work Product within the scope of Employee's employment or this Agreement, whether or not copyrightable or otherwise protectable.

6. **RETURN OF PROPERTY**. All Confidential Information, Work Product and all related documents, lists, customer lists, records, correspondence, memoranda, accounting records, financial statements or other tangible or intangible things relating to the business of the Company (and summaries thereof) that Employee originates or comes into Employee's possession in any way during the employment shall remain the sole property of the Company. Upon termination of employment, Employee shall immediately return to the Company all such items in Employee's possession, as well as all of the Company's property Employee has received for assistance in performing work duties. Employee shall be liable for damages to the Company for any such property that is not returned.

7. **COMPANY'S RIGHTS**. Employee acknowledges that the Company has expended substantial time and expense in the research and development of its Confidential Information, Work Product customer relationships, and vendor/manufacturer relationships, all of which are unique to the Company, or not generally known to others, which could be unfairly taken or used by others in competition with the Company. Accordingly, Employee agrees that the restrictions as to Confidential Information, Work Product, competition and solicitation (customers, vendors and employees) herein are reasonable, and that a breach of the non-competition/non-solicitation, Confidential Information and proprietary right provisions of this Agreement will cause the Company irreparable injury and damage which may not be compensable by receipt of money damages. The Company shall be entitled, in addition to any other available legal remedies, to injunctive relief to prevent a breach of this Agreement, including recovery of reasonable attorneys' fees and costs.

8. **SEVERABILITY**. The parties understand that the Company has attempted to limit Employee's right to compete and/or solicit only to the extent necessary to protect the Company from unfair competition. If any general provision of this Agreement is determined by a court of competent jurisdiction to be illegal or invalid for any reason whatsoever, then such provision shall be severed from this Agreement and shall not affect the validity of the remainder of this Agreement.

9. **GOVERNING LAW**. This Agreement and any claims or actions related thereto shall be governed by the laws of the state of Minnesota. The parties agree that any dispute or claim relating to this Agreement shall be venued or heard in the state of Minnesota or in a FINRA arbitration, if appropriate.

10. **ASSIGNMENT**. This Agreement shall be binding upon the parties and their permitted heirs, successors and assigns. The Company may assign its rights under this Agreement without consent of Employee.

11.     <u>SURVIVAL</u>.  The terms, conditions and obligations contained in this Agreement, shall survive termination of the employment relationship between the parties.

12.     <u>ENTIRE AGREEMENT</u>.  This Agreement constitutes the entire agreement between the parties with respect to the terms herein, and supersedes all prior agreements or understandings between the parties.  The parties agree that this Agreement and the terms herein cannot be waived, altered or modified, except in writing executed by each party.  The parties acknowledge that they have read and understood the terms and conditions of this Agreement, have had an opportunity to review this Agreement individually and with legal counsel, and expressly acknowledge that they understand both the terms and conditions and significance of entering into this Agreement.

**IN WITNESS HEREOF**, the parties have executed this Agreement as of the day and year first above written.

**PERSONAL WEALTH PARTNERS, LLC**

By: _____
     Its:  President—Daniel E. Steichen

**EMPLOYEE**:

_____
(Signature)

Gary D. Ryberg

# Exhibit B

SUBMIT A TIP (https://advisorhub.com/submittip/)     RECEIVE DAILY NEWS (https://advisorhub.com/newsletter-sign-up/)

RISING RATES
CAN IMPACT ALL FINANCIAL COMPANIES

Risks & Definitions

SELECT SECTOR
SPDRs

XLF  THE FINANCIAL SECTOR

April 29, 2020

# Finra Fines Kestra Over Recruiting Practice Jeopardizing Customer Privacy

by AdvisorHub Staff   |
Enforcement (https://www.advisorhub.com/category/enforcement/), News
(https://www.advisorhub.com/category/news/)

|

FINRA (HTTPS://WWW.ADVISORHUB.COM/FIRMS/FINRA/), KESTRA
(HTTPS://WWW.ADVISORHUB.COM/FIRMS/KESTRA/)

|

View Comments (https://www.advisorhub.com/finra-fines-kestra-over-recruiting-practice-jeopardizing-
customer-privacy/#disqus_thread)

SHARE THIS 

SUBMIT A TIP (https://advisorhub.com/submittip/?post-top)


Looking for income in an incomeless world?
AB's Efficient Income™ funds generate high income while balancing risk.
LEARN MORE →


TONY SIRIANNI PODCAST
An Industry in Transition

(https://advisorhub.com/the-tony-sirianni-
podcast/)



Advisorhub/Mason Braswell

The Financial Industry Regulatory Authority has censured Kestra Financial and fined it $125,000 for helping brokers it was recruiting give personal customer data to an outside firm helping them with their transition.

The arrangement caused the brokers' former firms to violate the Securities and Exchange Commission's privacy protection policy, known as Regulation S-P, according to a letter of acceptance, waiver and consent that Finra accepted on Tuesday from Kestra.

The sanctions illustrate the slippery slopes firms can encounter in efforts to help brokers transition their practices.

Sixty-eight recruited representatives who affiliated with Kestra between November 2017 and February 2019 disclosed to a Kestra-recommended third-party vendor social security numbers, driver's license numbers and other personal and financial information—including annual income and net worth—about customers they hoped to move, according to the consent letter.

The unidentified vendor prepared template spreadsheets with personal data fields, and Kestra employees sometimes guided brokers on filling them in when they were still with their former firms, according to the consent letter. Kestra typically reimbursed advisors for fees the vendor charged to help them generate new account documents populated with the spreadsheet data, the letter said.

"Kestra failed to take any steps to inquire whether the recruited representatives or their

broker-dealers at the time had notified customers about the disclosure of their nonpublic

personal information, nor did Kestra take any steps to inquire whether customers had

been given an opportunity to opt-out of having their information disclosed," the consent letter said. "Kestra also failed to provide any guidance to the recruited representatives concerning the disclosure of customers' nonpublic personal information to the vendor."

A spokeswoman for Austin-based Kestra, which was founded in 1997, declined to comment.

Wells Fargo Advisors sued (https://advisorhub.com/wells-seeks-tro-against-four-fas-affiliated-with-kestra/) four New Jersey brokers who joined Kestra in 2018 for allegedly taking client information, saying a client had received a package of pre-populated documents that included social security numbers, bank account numbers and account values. A judge turned down its request for an order to restrain the brokers from contacting former clients.

Kestra, which is majority owned by private equity firm Warburg Pincus, accepted the Finra sanctions without admitting or denying findings that its actions violated the self-regulatory group's Rule 2010. The broad-reaching rule requires member firms and their registered personnel to observe high standards of commercial honor and just and equitable principles of trade.

Kestra has almost 1,850 registered reps in 678 offices, according to the consent letter, which did not specify individual brokers who contracted with the third-party firm.

In recent years, Kestra has stepped up recruiting from employee-model firms. It recruited a $300 million-asset Merrill team (https://advisorhub.com/merrill-team-managing-300-million-in-northern-ohio-goes-indie/) in Ohio last summer and a $340 million-asset UBS Wealth Management USA team (https://advisorhub.com/kestra-unit-recruits-some-ubs-vets-to-an-ria-platform/) in Rhode Island two years ago.



(/customer-privacy-issues-cost-securities-america-125000/?
relatedposts_hit=1&relatedposts_origin=114124&relatedposts_position=0)
Customer Privacy Issues Cost Securities America $125,000
(/customer-privacy-issues-cost-securities-america-125000/?
relatedposts_hit=1&relatedposts_origin=114124&relatedposts_position=0)
Feb 24, 2021



(/cetera-to-pay-125k-for-customer-privacy-issues-tied-to-
relatedposts_hit=1&relatedposts_origin=1
Cetera to Pay $125K for Customer Privacy Issues Tied to Recruiting
(/cetera-to-pay-125k-for-customer-
relatedposts_hit=1&relatedposts_origin=
relatedposts_hit=1&relatedposts_origin=

(/finra-sidelines-two-brokers-who-took-client-info-to-new-
relatedposts_hit=1&relatedposts_origin
Finra Sidelines Two Brokers who Took Client Info to New Firms
(/finra-sidelines-two-brokers-who-
relatedposts_hit=1&relatedposts_origin=114124&relatedposts_position=2)

**NEWS**



(https://www.advisorhub.com/fearless-girl-statue-faces-another-move-nft-future/)
'FEARLESS GIRL' STATUE FACES ANOTHER MOVE, NFT FUTURE
(HTTPS://WWW.ADVISORHUB.COM/FEARLESS-GIRL-STATUE-FACES-ANOTHER-MOVE-NFT-FUTURE/)
Dec 2, 2021



(https://www.advisorhub.com/ex-merrill-star-who-jumped-to-j-p-morgan-sues-new-firm-for-poaching-her-billion-dollar-book/)
EX-MERRILL STAR WHO JUMPED TO J.P. MORGAN SUES HER OWN FIRM FOR POACHING BILLION-DOLLAR BOOK
(HTTPS://WWW.ADVISORHUB.COM/EX-MERRILL-STAR-WHO-JUMPED-TO-J-P-MORGAN-SUES-HER-OWN-FIRM-FOR-POACHING-HER-BILLION-DOLLAR-BOOK/)
Dec 2, 2021



(https://www.advisorhub.com/u5-defamation-wins-stack-up-but-tables-have-not-turned-to-brokers-advantage-lawyers-say/)
U5 DEFAMATION WINS STACK UP, BUT TABLES HAVE NOT TURNED TO BROKERS' ADVANTAGE, LAWYERS SAY
(HTTPS://WWW.ADVISORHUB.COM/U5-DEFAMATION-WINS-STACK-UP-BUT-TABLES-HAVE-NOT-TURNED-TO-BROKERS-ADVANTAGE-LAWYERS-SAY/)

Jun 29, 2021                    Feb 16, 2021

## Like this article? Let AdvisorHub come to you!

SIGN UP (HTTPS://ADVISORHUB.COM/NEWSLETTER-SIGN-UP/)

SHARE THIS   



(https://www.advisorhub.com/hedge-funds-bail-from-stocks-as-powell-covid-roil-markets/)

HEDGE FUNDS BAIL FROM STOCKS AS POWELL, COVID ROIL MARKETS (HTTPS://WWW.ADVISORHUB.COM/HEDGE-FUNDS-BAIL-FROM-STOCKS-AS-POWELL-COVID-ROIL-MARKETS/)

Dec 1, 2021



(https://www.advisorhub.com/exclusive-morgan-stanley-leaves-2022-grid-unchanged-sharpens-focus-on-asset-growth-and-lending/)

EXCLUSIVE: MORGAN STANLEY LEAVES 2022 GRID UNCHANGED, SHARPENS FOCUS ON ASSET GROWTH AND LENDING (HTTPS://WWW.ADVISORHUB.COM/EXCLUSIVE-MORGAN-STANLEY-LEAVES-2022-GRID-UNCHANGED-SHARPENS-FOCUS-ON-ASSET-GROWTH-AND-LENDING/)

Dec 1, 2021

AdvisorHub Recruiting Wir...

**RECRUITING WINNERS: 2020 YEAR IN REVIEW**

**FINANCIAL INDUSTRY PODCASTS**

| ALL | INDEPENDENCE |




Load More

## CURIOUS ABOUT SWITCHING BROKER-DEALERS?



Revenue 🛈

| | $3,000,000 |

Assets Under Management 🛈

| | $450,000,000 |

GET MY OFFERS

100% ANONYMOUS | CONTROL THE CONVERSATION

POWERED BY  X  . FOR

### Latest News ⊕
(https://advisorhub.com/news/?sidebar-menulink)

### Advisor Moves ⊕
(https://advisorhub.com/category/advisor-moves/?sidebar-menulink)

### Enforcement ⊕
(https://advisorhub.com/category/enforcement/?sidebar-menulink)

### Opinion ⊕
(https://advisorhub.com/category/opinion/?sidebar-menulink)

**About Us**
**Contact Us**
**Advertise**
**Events**
**Careers**

**GET OUR NEWSLETTER**
Industry focused content and breaking news.

**SIGN UP
(HTTPS://ADVISORHUB.COM/NEWSLETTER-SIGN-UP/?FOOTER)**

**CONTACT US**
EMAIL US (/contact)
1707 Post Oak Blvd.
#484
Houston, TX 77056

© 2021 AdvisorHub

| Terms of Use (https://www.advisorhub.com/terms-of-use/)

| Privacy Policy (https://www.advisorhub.com/privacy-policy/)

| Advertise (https://www.advisorhub.com/about/advertise/)

| Careers (https://www.advisorhub.com/about/careers/)